UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


| | | |
|---|---|---|
| OCEAN INNOVATIONS, INC., *et al.*, | ) | Case No.: 5:98 CV 1515 |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| RICK ARCHER, *et al.*, | ) | |
| | ) | |
| Defendants | ) | ORDER |

Pending before the court is the Renewed Motion for Summary Judgment on Infringement of Claims 1 and 4 of U.S. Patent 5,682,833 (the "'833 patent"), filed by Plaintiffs Ocean Innovations, Inc. and Jet Dock (together, "Plaintiffs or Jet Dock"). (ECF No. 257.) For the reasons stated below, Plaintiffs' Renewed Motion for Summary Judgment is granted.

## I.  FACTUAL BACKGROUND

In broad terms, the invention of the '833 patent is a method of placing a small watercraft on a floating dry dock, which is assembled from a group of floatation units. The dock is meant to allow an operator of a craft to drive the bow of the craft onto the dock so that the craft can be stored fully out of the water and the driver can get on and off the craft without getting in the water. In this

action, Plaintiffs claim that Defendant[1] Zeppelin Marine, Inc.'s ("Zeppelin") floating drive-on dry

dock, the Sport Port Ultra (the "Ultra") infringes Claims 1 and 4 of the '833 patent.

Claim 1 of the '833 patent, the only independent claim at issue, provides as follows:

> 1.  A method of placing a floating craft having a hull with an upwardly curved bow onto a dry dock comprising the steps of:
>
> selecting a plurality of floatation units from a first group of floatation units having a first buoyancy and a second group having a second buoyancy, the second group being less buoyant than the first group, so that the selected units have a total buoyancy sufficient to support the craft with its lowermost portion out of the water,
>
> assembling the selected units to form a dock having an axial extent defining a craft-receiving surface which is above the surface of the water when the dock does not have a craft on it, using flexible joints between the units which permit adjacent units to flex downwardly with respect to each other upon the imposition of a downward load,
>
> driving the craft up and onto the dock by forcing the bow of the craft against the floatation units at one axial end of the dock to force the units downward in the water beginning at the one axial end of the dock and moving progressively toward the other axial end of the dock as the craft moves axially along the dock.

'833 patent, col. 7, ll. 28-45, col. 8, ll. 1-6.

Claim 4, which is completely dependent on Claim 1, is also at issue.  Claim 4 covers:

> The method of claim 1 wherein the floatation units have generally planar top surfaces and the step of driving the craft up and onto the dock includes driving the craft up and onto the dock so that its hull presses downward on the top surface of at least some of the units so as to prevent those units from flexing with respect to the adjacent units.

_____

[1]  Defendant Rick Archer was dismissed from this lawsuit on May 19, 1999.

'833 patent, col. 8, ll. 15-20.

Defendant's Ultra is described in U.S. patent 5,795,098 and is formed of three sections: a ramp section, a mid-section, and a bow.  (*See* '098 patent, Pls.' Ex. A, ECF No. 268-2.)  Zeppelin disputes that its Ultra infringes either claim of the '833 patent and further contends that the '833 patent is invalid.

## II. PROCEDURAL HISTORY

On July 31, 2000, this court held a *Markman* hearing on the proper construction of the terms "floatation unit" and "flexible joint between the units" in Claim 1.  In an Order dated September 16, 2003, this court performed a claim construction analysis of the two terms.  (*See Markman* Order, ECF No. 121.)  This court found that a "floatation unit" is an airtight, individual structural constituent of a whole which is buoyed on water and that a "flexible joint between the units" is a point or position in the interval or position separating the floatation units of the dock, which point or position is capable of bending or flexing.  This court also rejected Zeppelin's argument that Claim 1 of the '833 patent is drafted in step-plus-function format and subject to the strictures of 35 U.S.C. § 112, paragraph 6.  (*See id.*)

On June 16, 2004, this court granted Jet Dock's motions for summary judgment on the issues of infringement and invalidity of Claims 1 and 4 of the '833 patent, and denied Zeppelin's motions for summary judgment.  (*See* Summ. J. Order at 3, ECF No. 197.)  Following a bench trial, this court awarded damages to Jet Dock for approximately $455,000.  (*See* Judgment Entry of June 25, 2004, ECF No. 225.)  This court also entered a permanent injunction against Defendant Zeppelin enjoining Zeppelin from infringing Claims 1 and 4 of the '833 patent.  (*See* Injunction Order, ECF No. 224.)

- 3 -

Thereafter, Zeppelin appealed to the Federal Circuit and Jet Dock cross-appealed.  Zeppelin appealed this court's construction of the two claim terms.  Zeppelin also argued that even under this court's claim construction, issues of fact existed which precluded summary judgment.  Jet Dock asserted that this court made erroneous factual findings regarding damages and abused its discretion by not awarding lost profits.

The Federal Circuit upheld this court's construction of the claim term "flexible joints between the units," *see Ocean Innovations, Inc. v. Archer*, 145 Fed. Appx. 366, 369 (Fed. Cir. 2005), but altered this court's construction of the claim term "floatation units," construing the term as requiring the floatation units to be both "airtight" and "hollow."  *Id.* at 371.  Having changed the claim construction, the Federal Circuit did not reach Zeppelin's argument that issues of fact precluded summary judgment, nor did it reach Jet Dock's cross-appeal with respect to damages.  *Id.* The Federal Circuit reversed this court's summary judgment Order in Jet Dock's favor and remanded the case.  *Id.*

### III.  SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law . . . .

Fed. R. Civ. P. 56(c).  Federal Rule of Civil Procedure 56(e) specifies the materials properly submitted in connection with a motion for summary judgment:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent

> to testify to the matters stated therein . . . .  The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.  When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e).  However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In reviewing summary judgment motions, this court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standard.  Thus, in most civil cases the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id*. at 252.

## IV. LAW AND ANALYSIS

### A. Validity of the '833 Patent

As an initial matter, this court declines to reconsider the validity of the '833 patent.  This court previously determined that the '833 patent is valid.  (*See* Summ. J. Order at 33.)  The Federal

Circuit did not remand on this issue and the court finds no basis upon which to reconsider its ruling. Defendant concedes that the Federal Circuit's construction of "floatation units" as including "hollow" for purposes of infringement failed to necessarily implicate validity. (*See* Def.' Sur-Reply in Opp'n to Pls.' Renewed Mot. for Summ. J. at 17.) Because this court does not find that the claim construction has any bearing on the issue of validity, the court will not consider the issues that Defendant has raised regarding invalidity.[2]

## B. Claim Construction

A court's consideration of a patent infringement claim is a two-step process. The first step is for the court to make the legal determination of how the claim terms at issue are to be construed. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir.1995). The second step is to determine whether the accused product infringes, either literally or by equivalents, by comparing the properly construed claims to the accused product. *Id.* This court previously construed the term "floatation unit" to mean an airtight, individual structural constituent of a whole which is buoyed on water. (*See* Summ. J. Order at 7-8.) However, the Federal Circuit found that determination to be in error, and instructed that "one skilled in the art reading the '833 patent claims, in light of the

---

[2]     In an attempt to corroborate Dave Rueckert's (Zeppelin's President and the designer of the Ultra) testimony that he that he invented first, Defendant seeks to offer the additional evidence of: (a) an agreement between Rueckert and a lender for the construction of a roto-mold; (b) a ledger sheet showing that the lender lent money for "Ultra Molds" to Rueckert; (c) a check from the lender to Rueckert; and (d) a promotional video made sometime between 1992 and 1994 showing the Ultra prototype. Defendant also argues that the '833 patent is invalid in view of prior art and the specification fails to satisfy the statutory and best mode requirements. Defendant seeks to introduce evidence consisting of Eva's testimony in another case concerning how he sealed the floatation units he used when first making the invention. There is nothing to suggest that any of this evidence was not available to Defendant and could not have been obtained when this court determined that the '833 patent was valid in June of 2004.

- 6 -

'833 patent's disclosure, would understand that the 'floatation units' in the claimed invention are hollow." *Ocean Innovations, Inc.*, 145 Fed. Appx. at 371.  Defendant argues that claim construction has already occurred and now the court must compare the properly construed claims to the Ultra, as a matter of fact.  However, the Federal Circuit did not define "hollow."  Therefore, this court must first define the term "hollow," before it can proceed to the second step and determine whether the accused product infringes by comparing the properly construed claims to the accused product.

In the instant case, Plaintiff asserts that "hollow," as used in the '833 patent, means "having a cavity within which may or may not contain another material."  (Pls.'s Renewed Mot. for Summ. J. at 5, ECF No. 257.)  Defendant argues that "hollow" means "empty."  (Def.'s Opp'n to Pls.' Renewed Mot. for Summ. J. at 12, ECF No. 268.)  As the court explained in *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996),

> It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history. [Citation omitted.] Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language. . . . Although words in a claim are generally given their ordinary and customary meaning, a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history.

*Id.*

Additionally, the Federal Circuit in *Texas Digital Sys. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002) recently clarified the extent to which dictionaries, encyclopedias and treatises may be used to assist the court in determining the ordinary and customary meanings of claim terms, explaining that they "are always available to the court to aid in the task of determining meanings that would have been attributed by those of skill in the relevant art to any disputed terms used by the inventor in the claims." *Id.* at 1202.  In the instant case, turning to a dictionary to determine the

- 7 -

ordinary and customary meaning of the word "hollow" is inconclusive, as different dictionaries give different definitions, either "having a cavity within"[3] or "empty,"[4] and some dictionaries include both definitions.[5]

The *Texas Digital* court went on to explain that the intrinsic record, such as the patent specification, must be examined to identify "which of the different possible dictionary meanings of the claim terms in issue is most consistent with the use of the words by the inventor." *Texas Digital*, 308 F.3d at 1202.  In this case, Plaintiff argues that "hollow" does not mean "empty" because the patents incorporated by reference into the '833 patent describe "hollow" floatation units that may contain either air, or water, or foam.  (*See* '833 patent, col.3, ll. 30 – 33, Pls.' Ex. 1, ECF No. 257-2.)

Where the patent specification incorporates by reference other patents to help define what is disclosed, those publications are "highly relevant to one of ordinary skill in the art for ascertaining the breadth of the claim term." *Aquatex Industries, Inc. v. Techniche Solutions*, 419

---

[3]  Plaintiff cites the AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2000), for the definition of hollow as : "1: having a cavity, gap or space within: a hollow wall."  Plaintiff also cites the Merriam-Webster Dictionary On Line, www.m-w.com, for the definition of the adjective hollow as, " 2: having a cavity within < *a hollow tree*>."

[4]  Defendant cites the RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 677 (1966) for the definition of hollow as "1. Having a space or cavity inside; not solid; empty."  Defendant also cites the AMERICAN HERITAGE DICTIONARY(2d ed. 1982) for the definition of "hollow" as "1. Having a cavity, gap, or space with: *a hollow wall*. . . . 3. A void; emptiness. " The court takes note of the fact that the dictionary definitions cited by Defendant both begin exactly as do the dictionary definitions mentioned by plaintiffs, namely, with the phrase "having a cavity within."

[5]  This court looked to the Oxford English Dictionary, available on line at www.dictionary.oed.com, which defined hollow in relevant part as "1. a. Having a hole or cavity inside; having an empty space in the interior; opp. to solid. b. Having an empty or vacant space beneath."

F. 3d 1374, 1381 (Fed Cir. 2005); *see also Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (*en banc*) ("The specification is always highly relevant to the claim construction analysis."). The '833 patent says that the floatation units it uses are "substantially similar to that shown in U.S. Patents 3,824,644 and 4,604,962, and the disclosure of those patents is incorporated in its entirety into this application." '833 patent, col. 3, ll. 30 – 33. The Guibault patent, U.S. Patent 4,604,962, states, "[e]ach floating unit 22 is water-proof and preferably hollow and may be moulded out of synthetic resins such as a high density polyethylene. A plastic foam may fill each unit 22." '962/Guibault Patent, col. 2, ll. 35 – 39. Therefore, the '833 patent has a disclosure incorporated by reference that explicitly describes the floatation unit as hollow, but may be filled with foam. Consequently, hollow cannot be read to exclude foam-filled.

The '833 patent also incorporates the Stranzinger patent, U.S. Patent 3,824,644. The '644/Stanzinger patent also supports the conclusion that "hollow" as used in the '833 patent does not exclude the possibility of containing something. The '644/Stanzinger patent shows the same floatation units as the '962/Guibault patent and reveals that they are "hollow" and that they may be partially filled with water. '644/Stanzinger patent, col. 2, ll. 1-2, 18 – 25 ("A floating element according to the invention comprises a hollow prismatic body. . . . If the bottom of the floating element is drilled through . . ., water can enter its body.") Thus, of the different dictionary meanings, having a cavity within "is most consistent with the use of the words by the inventor." *Texas Digital*, 308 F.3d at 1202.

Additionally, the Ringdal patent, U.S. Patent 3,977,030, though not incorporated by reference in the '833 patent, is useful to illustrate how those of ordinary skill in the art would interpret the term "hollow." *See Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1578

- 9 -

(Fed. Cir. 1996) ("A technical term used in a patent document is interpreted as having the meaning that it would be given by persons experienced in the field of the invention . . . ."). The '030/Ringdal patent describes a dock with a floating ramp made of rollers across which a boat can be hauled to remove it from the water. That patent describes that "the rollers can preferably be effected as hollow bodies and filled with air, or preferably filled with plastic foam . . . ." '030 patent, col. 1, ll. 56-58. The sentence structure demonstrates that, as used by those of ordinary skill in the art, a "hollow" body may nevertheless be "filled" with something.

That a float is "hollow" and may contain something is consistent with the common usage of "hollow" as reflected in the cited dictionary definitions, *supra*. The '833 patent says nothing about requiring "hollow" units to be "empty." Quite to the contrary, the specification indicates that the hollow floatation units may be either filled with air, be partially flooded with water to reduce buoyancy, or have foam inside.

Based on the above-mentioned considerations, this court holds that "hollow" as used in the '833 patent, means having a cavity or space within, that may or may not be filled with another material.

## C. Infringement

Now this court must  perform the second step of the infringement analysis, evaluating the accused device to determine whether all of the claim limitations are present in the accused device, either literally or by a substantial equivalent. *See Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 988 (Fed. Cir. 1999). To show literal infringement of a patent, a patentee must supply sufficient evidence to prove that the accused product meets every element or limitation of a claim. *See Lemelson v. United States*, 752 F.2d 1538, 1551 (Fed.Cir.1985) ("It is . . . well settled that each

element of a claim is material and essential, and that in order for a court to find infringement, the plaintiff must show the presence of every element . . . in the accused device.").  If, however, even one limitation is not met, then the product does not literally infringe.  *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000); *Zodiac Pool Care, Inc. v. Hoffinger Indus., Inc.*, 206 F.3d 1408, 1415 (Fed. Cir. 2000).

### 1. The Elements of Claim 1 of the '833 Patent

*a. Placing Floating Craft Having a Hull with an Upwardly Curved Bow onto a Dry Dock*

This court's previous conclusion that the Ultra permits the placing of a floating craft having a hull with an upwardly curved bow onto a dry dock was not altered by the Federal Circuit's opinion and the court sees no basis to reconsider it here.

*b. Plurality of Floatation Units*

Pursuant to the Federal Circuit's opinion, the term "floatation unit," is construed to mean an "airtight, hollow, individual structural constituent of a whole which is buoyed on water." Considering that this court has determined that the term "hollow," as used in the '833 patent, means having a cavity or space within, the Ultra meets this element of Claim 1, as discussed below.

- 11 -

Zeppelin's dock sections are made with an airtight[6] polyethylene shell.  (*See* Rueckert Decl. ¶ 5, Pls.' Ex. 3, ECF No. 257-4,  ("Ultra . . . is constructed with an outer shell of thin gauge polyethylene.")  As Rueckert explained the manufacturing process, the styrofoam is "loose-filled and then fused."  (*See* Rueckert Dep. at 71, Pls.' Ex. 7, ECF No. 257-7.)  Rueckert has stated that he can make the Ultra floatation units without the foam, but to do so requires a thicker shell wall, making the resulting dock section more expensive.  (*See* Rueckert Decl.¶ 5.)  Rueckert admits that the foam does not stick to or bond with the shell, and that it does not affect the buoyancy of the shell. (*See* Rueckert Decl. ¶ 6, and Rueckert Dep. at 77-78.)  Zeppelin's advertising states that the Ultra is "foam filled."  (*See* Zeppelin's Consumer Ads,  Pls.' Ex. 6, ECF No. 257-6.)  If the sections of the Ultra were solid, they could not be "filled" with anything.  Considering that the definition of the term "hollow," as used in the '833 patent, means having a cavity or a space within, Zeppelin's dock sections are hollow and constitute floatation units.

Finally, the Ultra is made of a "plurality" of floatation units as it is assembled out of three sections - the ramp, middle and bow.  (*See* '098 patent, Pls.' Ex. A, ECF No. 268-2.)

---

[6]        This court previously concluded the Ultra had an airtight shell.  (*See* Summ. J. Order at 7-9, ECF No. 197.)  Defendant seeks reconsideration of the "airtight" issue because, according to Defendant, "there is evidence available now that was not before this Court at the time summary judgment was briefed originally (i.e. testimony by one of the inventors of the' 833 patent that bung holes of the type used in the Ultra are not airtight). . . ."  (Def.'s Opp'n to Pls.' Mot. for Summ J. at 3.)  Defendant also relies on a new declaration from Rueckert, in which he states that the "Ultra cannot be made thoroughly airtight. . . ."  (11/03 Rueckert Decl. ¶ 5, Def.'s Ex. C, ECF No. 268-4.)

This court declines to revisit the issue of whether the Ultra is airtight.  The court finds no basis to alter its prior conclusion on this issue. As indicated above, the court will not consider the additional evidence submitted by Defendant on this issue as Defendant has not demonstrated that this evidence could not have been presented earlier.

- 12 -

*c. Floatation Units of Differing Buoyancies*

This court previously determined that the Ultra sections are of different buoyancies.  (*See* Summ. J. Order at 10.)  The Federal Circuit's opinion did not address this issue and the court finds no basis to reconsider it.

*d. Total Buoyancy Sufficient to Support a Craft with its Lowermost Portion Out of the Water*

This court previously determined that the Ultra has a total buoyancy sufficient to support a craft with its lowermost portion out of the water.  (*See* Order at 10-11.)  The Federal Circuit's opinion did not address this issue and the court finds no basis to reconsider it.

*e. Dock Having an Axial Extent Defining a Craft-Receiving Surface*

This court previously determined that the lengthwise connection of the Ultra's floatation units form a dock which has a slot or trough into which a craft having a V-shaped hull may be driven.  (*See* Order at 11.)  The Federal Circuit's opinion did not address this issue and the court finds no basis to reconsider it.

*f. Craft-Receiving Surface which is Above the Surface of the Water
when the Dock does not have a Craft on it*

This court previously determined that the Ultra's craft-receiving surface is above the water when the Ultra does not have a craft on it.  (*See* Order at 11.)  The Federal Circuit's opinion did not address this issue and the court finds no basis to reconsider it.

*g. Flexible Joints Between the Units which Permit Adjacent Units to Flex Downwardly
with Respect to Each Other Upon the Imposition of a Downward Load*

The Federal Circuit did not disrupt this court's construction of the claim term, "flexible joint between the units" as a point or position in the interval or position separating the floatation units of the dock, which point or position is capable of bending or flexing.        This court previously

- 13 -

concluded that the Ultra has flexible joints between the units which permit the adjacent units to flex downwardly with respect to each other upon the imposition of a downward load. (*See* Order at 11-14, ECF No. 197.)

> *h. Driving the Craft Up and Onto the Dock by Forcing the Bow of the Craft against the Floatation Units at One Axial End of the Dock to Force the Units Downward in the Water Beginning at the One Axial End of the Dock and Moving Progressively Toward the Other Axial End of the Dock as the Craft Moves Axially Along the Dock*

This court previously determined that the Ultra met this element of Claim 1, stating that "Zeppelin does not dispute that a craft is driven up and onto the Ultra by forcing the bow of the craft against the floatation units at one axial end of the Ultra to force the units downward in the water beginning at the one axial end of the Ultra and moving progressively toward the other axial end of the Ultra as the craft moves axially along the Ultra."[7] (*See* Order at 14, ECF No. 197.)

Because the Ultra meets each of the limitations of Claim 1, it literally infringes this claim of the '833 patent.

## 2. The Elements of Claim 4 of the '833 Patent

The Ultra also meets each of the elements of Claim 4, as discussed below.

### a. The Method of Claim 1

As the court has just found, the Ultra infringes Claim 1 of the '833 patent. It thus meets the first element of Claim 4.

---

[7] Defendant now argues that it does not perform the step of driving a craft up and onto the dock. This argument is addressed *infra*.

- 14 -

*b. The Floatation Units Have Generally Planar Top Surfaces*

This court previously determined that the Ultra's floatation units have generally planar top surfaces. (*See* Summ. J. Order at 15-16.)  The Federal Circuit's opinion did not address this issue and the court finds no basis to reconsider it.

*c. Driving the Craft Up and Onto the Dock so that its Hull Presses Downward*
*on the Top Surface of at Least Some of the Units so as to Prevent those Units from*
*Flexing with Respect to the Adjacent Units*

Lastly, this court previously determined, and Zeppelin did not dispute, that when a craft is driven up and onto the Ultra, the craft's hull presses downward on the top surface of at least some of the floatation units so as to prevent those units from flexing with respect to the adjacent units. (*See* Order at 16-17, ECF No. 197.)  The Federal Circuit's opinion did not address this issue and the court finds no basis to reconsider it.[8]

Accordingly, the Ultra meets each and every element of Claim 4 of the '833 patent, and therefore, literally infringes this claim.

### 3. Direct Infringement Under § 271(a)

Plaintiff seeks summary judgment under § 271(a) for direct infringement, as well as under § 271(b) and (c) for inducing infringement and contributory infringement.  Section 271(a) of title 35 sets forth the requirements for a claim of direct infringement of a patent and states, "[e]xcept as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent."  35 U.S.C. § 271(a).

---

[8]     Again, Defendant now argues that it does not perform the step of driving a craft up and onto the dock.  This argument is addressed *infra*.

Defendant  argues that because the '833 patent is drafted as a method claim, the Ultra, a product, cannot be found to infringe the '833 patent. "[A] method or process claim is directly infringed only when the process is performed." *Joy Technologies v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed. Cir. 1993).  "The law is unequivocal that the sale of equipment to perform a process is not a sale of the process within the meaning of section 271(a)."[9]  *Id.*  Defendant argues that it does not "drive" a craft up and onto the dock, and that this last step of the '833 method claim, if it is done by anyone,  is done by its customers.  Defendant also argues that Plaintiffs offer "no evidence of any single person or entity actually performing all steps of the claimed method using the Ultra, nor does it even offer evidence of anyone actually performing the last step of the method using the Ultra."  (Def.'s Opp'n to Pls.' Renewed Mot. for Summ. J. at 9.)

Plaintiffs are not relying solely on Defendant's production of the Ultra, i.e., the product. Plaintiff points to evidence in the record establishing that both Defendant, and Defendant's customers,  have used the Ultra as intended by driving a craft onto it, thus meeting the method described in the '833 patent.

First, Plaintiffs point to evidence in the record which shows Rueckert driving a boat onto an Ultra.  (*See* Zeppelin Promotional DVD, Pls.' Ex. 4, ECF No. 257.)  Plaintiffs argue that the steps of selecting and assembling the Ultra shown in Zeppelin's promotional DVD had obviously been completed by Rueckert or some other agent of Zeppelin.  Defendant argues that this DVD has no evidentiary foundation and that it does not show the Ultra, but rather, an earlier prototype.  (Def.'s Opp'n to Pls.' Mot. for Summ J. at 8 (citing 11/05 Rueckert Decl. ¶¶ 9-10, Def.'s Ex. J.)  Construing

---

[9]        Such a sale may be indirect infringement, see *infra*.

the evidence in the light most favorable to Defendant at this stage, this court must accept Defendant's assertion.

However, Plaintiffs also point to the pictures of boats being driven onto an Ultra, attached to the 1999 Rueckert declaration. (*See* Rueckert Decl., Pls.'s Ex. D, ECF No. 268-5.)  The declaration of Mr. Allan Eva, chairman of Plaintiff Jet Dock Systems, Inc. and an inventor named in the '833 patent, states that the passenger in the boat is Rueckert.  (*See* Decl. of W. Allan Eva ¶ 8, Pls.' Ex. 17, ECF No. 274-3.)  Plaintiffs also point to Rueckert's deposition testimony which establishes that he has used an Ultra to drydock his boat, Ginger Snapper.  (*See* Rueckert Dep. at 160-162,  Pl.'s Ex. 18, ECF No. 274-4.)  Considering this evidence, there is no genuine issue of material fact concerning whether or not Defendant has driven a craft onto an Ultra.  Consequently, Defendant has directly infringed the '833 patent and is liable for direct infringement under § 271(a).

Second, Plaintiffs also show direct infringement by Zeppelin's customers.[10]  Direct infringement of a patented method may be established through different actors performing different steps of a method.  *See, e.g.*, *Metabolite Laboratories, Inc. v. Laboratory Corp. of America Holdings (d.b.a. LabCorp)*, 370 F.3d 1354, 1364 (Fed. Cir. 2004); *see also Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261 (Fed. Cir. 1986).[11]  In *Metabolite*, the Federal Circuit found that there was

---

[10]     Once there is a finding of direct infringement, Defendant can be held liable for indirect infringement under § 271(b) and (c), discussed *infra*.

[11]     Defendant's cited case, *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1318 (Fed. Cir. 2005) is inapposite because there the infringement claim involved a system that was partly within and partly outside of the United States and the issue was whether "the using, offering to sell, or selling of a patented invention is an infringement under section 271(a) if a component or step of the patented invention is located or performed abroad."  *Id.* at 1315.  The court noted that the territorial reach of § 271 is limited and held  that "a process cannot be used 'within' the United States as required by section 271(a) unless each of the steps is performed within this

sufficient circumstantial evidence in the record to find that various physicians, who were non-parties to the suit and performed only the second step of the method, directly infringed the method claim at issue and therefore, the defendant could be held liable for inducing infringement.[12]  *Id*; *see also Moleculon*, 793 F.2d 1261 at 1272 (holding that although method claims could only be directly infringed by non-party puzzle-users who attempted to solve the Rubic's cube puzzle, and not by the defendant that had made the accused puzzles, defendant was liable for inducing infringement.).

    In the instant case, Plaintiffs have shown the existence of direct infringement by Defendant's customers who drive crafts onto Ultras.   There is no question that the Ultra floatation units are made for and sold by Defendant.  Customers purchase an Ultra which is fitted to their boat by the salesman.  Rueckert's declaration makes this clear: "additional mid sections can be added to accommodate larger boats." (Rueckert Decl. ¶ 3,  Pls.' Ex. D, ECF No. 268-5.)  In the course of selling, the appropriate number of dock sections are selected, and the dock is shipped to a customer site where it is assembled.  Each Ultra is assembled in the manner illustrated in the video instructions distributed by Zeppelin.  (*See* Zeppelin Promotional DVD, Pls.' Ex. 4.)  Finally, the drive-on step is performed by Zeppelin customers, as Eva observed and described in his declaration. (*See* Eva Decl. ¶¶ 3, 5, Pl's Ex. 17; *see also* Rueckert Decl. ¶ 3, Pls.' Ex. D, ECF No. 268-5 stating that Rueckert "personally observed a craft . . .utilize the Ultra.")  Although Plaintiffs' evidence is circumstantial in some respects, the Federal Circuit has said, "[I]t is hornbook law that direct evidence of a fact is not necessary.  Circumstantial evidence is not only sufficient but may also be more certain, satisfying and persuasive than direct evidence."  *Metabolite*, 370 F.3d at1365.

---

country." *Id.* at 1318.

[12]     This court will consider Defendant's liability for inducing infringement *infra*.

Even when viewing the evidence in the light most favorable to Defendant, this court finds the existence of direct infringement by Defendant's customers.  This court also finds that Defendant directly infringed the '833 patent and is therefore liable for direct infringement under § 271(a). Plaintiffs' Renewed Motion for Summary Judgment on the issue of direct infringement under § 271(a) is therefore granted.

### 4. Inducement Infringement Under § 271(b)

"Although not direct infringement under section 271(a), a party's acts in connection with selling equipment may, however, constitute active inducement of infringement or contributory infringement of a method claim under 35 U.S.C. § 271(b) and (c)." *Joy Technologies*, 6 F.3d at 774. "Liability for either active inducement of infringement or for contributory infringement is dependent upon the existence of direct infringement." *Id.*  As discussed above, this court has found the existence of direct infringement, both by Defendant, and by Defendant's customers.

Under Section 271(b), one who "actively induces infringement of a patent shall be liable as an infringer. . . ." 35 U.S.C. § 271(b).  Inducement of infringement requires intent.  Plaintiffs have the burden "of showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements." *Minnesota Mining and Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1305 (Fed. Cir. 2002) (citation omitted).  As the Federal Circuit noted in *MercExchange, LLC v. eBay, Inc.*, 401 F.3d 1323 (Fed. Cir. 2005),

> We have construed that statute to require proof of intent, although there is a "lack of clarity concerning whether the required intent must be merely to induce the specific acts [of infringement] or additionally to cause an infringement." [citations omitted.] Nevertheless, a patentee must be able to demonstrate at least that the alleged inducer had knowledge of the infringing acts in order to demonstrate either level of intent.

*Id.* at 1332.

- 19 -

Plaintiffs have shown that Defendant had knowledge of the infringing acts. Plaintiffs rely on two notice letters that it sent to Zeppelin shortly after the '833 patent issued, stating that Jet Dock believed Zeppelin was infringing the '833 patent. (*See* Notice Letters, Pls.' Ex. 13 and 14, ECF Nos. 257-13 and 257-14.) Defendant does not dispute receiving these letters. Plaintiffs also point to Defendant's print advertisements which likewise demonstrate an intent to have consumers drive their crafts up into the dock. (*See* Zeppelin's Consumer Ads, Pls.' Ex. 6, ECF No. 257-6.)

Plaintiffs have sufficiently proved that Defendant induced others to perform the method described in the '833 patent, after having received notice. *See Moleculon Research Corp.*, 793 F.2d at 1272 (Fed. Cir. 1986) (holding that circumstantial evidence of extensive sales and dissemination of an instruction sheet can support a finding of direct infringement by the customer and inducement of infringement by the defendant.); *see also Minnesota Mining and Mfg. Co.*, 303 F.3d at 1305 (reasoning that the accused inducer "was aware of the . . . patents and supplied the infringing products to . . . customers with instructions on how they were to be used, which, when followed, would lead to infringement."). Consequently, this court finds that there is no genuine issue of material fact regarding whether Defendant induced infringement under § 271(b). Plaintiffs' Renewed Motion for Summary Judgment on the issue of induced infringement is therefore granted.

### 5. Contributory Infringement Under § 271(c)

Contributory infringement liability arises when one "sells within the United States . . . a[n] apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use . . . ." 35 U.S.C. § 271(c). To succeed on a claim of contributory infringement, Plaintiffs must

show Defendant "knew that the combination for which its components were especially made was both patented and infringing." *Golden Blount, Inc. v. Robert H. Peterson Co.*, 365 F.3d 1054, 1061 (Fed. Cir. 2004) (citation omitted).  Plaintiffs must also "show that [Defendant's] components have no substantial noninfringing uses." *Id.*  (citing *Alloc, Inc. v. ITC*, 342 F.3d 1361, 1374 (Fed. Cir. 2003)).

Plaintiffs have shown that Defendant knew of the '833 patent at least since the notice letters were sent in January 1998, and such letters are enough to satisfy the intent requirement of § 271(c). *See Trell v. Marlee Electronics Corp.*, 912 F.2d 1443, 1447 (1990) (explaining that "the knowledge requirement of section 271(c) limited an alleged contributory infringer's liability to sales made after it received a letter from the patent holder informing it of the existence of the patent." (quoting *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 488 (1964))) .

Plaintiff also points to Rueckert's statement that his Ultra was "designed to permit drive on docking for personal water crafts and small boats."  (Rueckert Decl. ¶ 3, Pls.' Ex. D, ECF No. 268-5.) Plaintiff argues that this statement is  conclusive of the no-other-use issue.  Additionally, Plaintiffs point to Defendant's advertising, none of which suggests that the Ultra has any purpose or use beyond use as a floating drive-on dry dock.  (*See* Zeppelin's Consumer Ads, Pls.' Ex. 6.) Considering this evidence, Plaintiffs have met their burden of showing that Defendant "knew that the combination for which its components were especially made was both patented and infringing" and that the Ultra has "no substantial noninfringing uses." *See Golden Blount, Inc.*, 365 F.3d at 1061.  No disputed issues of material fact exist.  Accordingly, Plaintiffs' Motion for Summary Judgment on the issue of contributory infringement under § 271(c) is granted.

- 21 -

## V.  CONCLUSION

For the foregoing reasons, the court finds that Defendant has infringed Claims 1 and 4 of the '833 patent under § 271(a), (b), and (c).  Therefore, Plaintiffs' Renewed Motion for Summary Judgment is granted.  (ECF No. 257.)

IT IS SO ORDERED.

/s/*SOLOMON OLIVER, JR.*
UNITED STATES DISTRICT JUDGE

March 15, 2007